UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DEONZAE JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:18-CV-1537 PLC |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner of Social Security | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Deonzae Johnson seeks review of the decision by Defendant Social Security Commissioner Andrew M. Saul denying his applications for Disability Insurance Benefits (DIB), Supplemental Security Income (SSI), and Child Insurance Benefits under the Social Security Act. For the reasons set forth below, the case is reversed and remanded.

I. **Background and Procedural History**

In July 2015, Plaintiff, who was born October 25, 1993, filed applications for DIB, SSI, and Child's Insurance Benefits[2] alleging that he became disabled on May 12, 2015 due to paranoid schizophrenia, psychosis, and schizo-affective disorder. (Tr. 86, 96, 106). The Social Security Administration (SSA) denied Plaintiff's claims, and his mother Kimberly Johnson filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 119-28, 129-31)

In November 2017, the ALJ conducted a hearing by videoconference at which Plaintiff, Ms. Johnson, and a vocational expert testified. (Tr. 55-78) In a decision dated March 7, 2018,

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.
[2] The SSA denied Plaintiff's previous applications for Child's Insurance Benefits in February 2012 and August 2012. (Tr. 107)

the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from May 12, 2015, through the date of this decision[.]" (Tr. 25-36) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council and submitted new evidence, including school records from Forest Park Community College and treatment records from "Psych Care Consultants." (Tr. 1-7) The SSA Appeals Council denied review. (Id.) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     Evidence before the ALJ

Plaintiff testified that he was twenty-four years old and had a high school diploma. (Tr. 55-56). He had been attending Forest Park Community College for "two or three years," but remained at "a freshman level" because it was "hard to pretty much adapt. The voices or whatever in my head keeps pretty much…distracting me 24/7…." (Tr. 56)

Plaintiff previously worked at Wendy's as a "lead closer," or cleaner. (Tr. 57) Plaintiff testified that Wendy's "was just using me, because they knew, like, I was moving fast, ADHD," and he "ended up leaving, because it was new management." (Tr. 57-58) Plaintiff had also worked as lead closer at Hardee's, but he left that job because "I just felt like I'll just stick with school, do something else, because it wasn't getting me nowhere, just sitting there, working." (Tr. 58) Plaintiff stated he also cooked at the restaurants. (Tr. 59) Prior to working at Hardee's, Plaintiff worked "off and on" performing "little assembly line jobs" for American Staffing. (Id.)

When the ALJ asked Plaintiff what medical conditions prevented him from working, Plaintiff answered: "I mean, I guess whatever it is, the bipolar-ness or the schizophrenia…I just know I hear voices, so the voices have me just all over the place." (Tr. 60) Plaintiff explained that the voices said "negative things, to kill, harm my family, different things like that, and then,

when they come down to it, like I try to stray [sic] away and isolate myself from everyone." (Id.) Plaintiff stated that he heard the voices daily and did not know what triggered them. (Id.) Plaintiff also stated that his "mind just black[s] out sometimes." (Tr. 62)

On a typical day, Plaintiff spent time alone and "every now and then, I just do whatever the task is, but…it just be hard for me to get through certain tasks, because…I start stuff and move on." (Tr. 61) Plaintiff testified that he used to help his grandfather "cut the grass" but he "stopped using hedge cutters, because I tried to harm an animal, but I thought it was…something else….I thought it was, like, demons or something…." (Tr. 61) In regard to sleep, Plaintiff stated "I barely get that much sleep. All I do is just stay woke at night. I walk around and just do random stuff," such as drawing, listening to music, or being "stuck in…a spiritual trance or something." (Tr. 64-65) Plaintiff did not socialize because "all my old friends is pretty much drug addicts." (Tr. 65)

Plaintiff affirmed that he had a history of drug use but stated he stopped using drugs in 2015 in the hopes that, "if I do this, maybe the voices will stop[.]"[3] (Tr. 62) Despite no longer using drugs, "I still hear everything. It's the same thing, so I just try to cope and deal with it." (Id.) When the ALJ asked what was significant about his May 2015 alleged onset date, Plaintiff explained that he smoked K2 and began "tripping, doing odd stuff" and heard "voices that pretty much wanted me to harm my family[.]" (Tr. 63) Plaintiff was subsequently hospitalized for "the whole summer." (Tr. 64)

Ms. Johnson also testified at the hearing. (Tr. 69) She stated that Plaintiff lived "between my home and his grandfather's" because "it's better for him to stay with my parents, to watch him at every move. . . ." (Tr. 69, 70) Ms. Johnson testified that Plaintiff had been

---

[3] Plaintiff stated: "I did every single drug except for mushrooms." (Tr. 63) He had not used "meth, cocaine, anything other than marijuana since 2015." (Id.)

3

attending Forest Park for four years and was still taking the same reading and math courses "that they gave him the first semester that he started school." (Tr. 70) Ms. Johnson explained that she had decided to "keep him in school just to be able to try to go on with his life…regardless if he passes the courses or not." (Tr. 71)

When Plaintiff's counsel asked Ms. Johnson about Plaintiff's behaviors that she considered "concerning," she answered: "He can't concentrate. I write things down, a list of things for him to do. He's not allowed to cook. He's not allowed to wash….Lack of concentration, talking to himself. I feel that a lot of religion is spoke on when he's having, like, these crashes." (Tr. 70) Ms. Johnson described "crashes" that Plaintiff experienced about "once a week," during which "it's kind of like it's a different person. One minute, he's talking. The second, it's kind of like he's staring in space….With the religion, it's kind of like certain people are the devil. He's hearing spirits talk to him. . . ." (Tr. 70-71)

Ms. Johnson stated that Plaintiff had been seeing Dr. Malik for the last two or three years, and he received 400-milligram Abilify injections once a month. (Tr. 71) Ms. Johnson stated that Plaintiff worked eight or nine months at Wendy's and "maybe two months" at Hardee's. (Tr. 72) Ms. Johnson testified that she was "happy" when Plaintiff got the job at Wendy's "so he'll be able to have, you know, money, interact with people, and everything just kind of went downhill. He was starting to miss days. He wasn't concentrating. He had burnt himself on the job. . . ." (Tr. 72)

Finally, a vocational expert testified that Plaintiff's past work was classified as "cook, fast-food[,]" which was "SVP 5, medium." (Tr. 74) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience who had no exertional limitations but who "must avoid all exposure to dangerous machinery…and must

4

avoid all exposure to unprotected heights[]" and who could "perform work limited to simple, routine tasks and can have occasional interaction with the public, coworkers, and supervisors." (Tr. 74) The vocational expert testified that such an individual would not be able to do any of Plaintiff's past work but would be able to perform other work in the national economy, including the jobs of cleaner, industrial; laundry laborer; and kitchen helper. (Tr. 75) The vocational expert stated that all three jobs would remain available if the hypothetical individual also "could have few workplace changes and no fast-paced production work." (Id.)

The ALJ then asked the vocational expert, whether the hypothetical individual would be able to maintain employment if he was "off task for 15% of the day in addition to regularly scheduled breaks." (Tr. 76) The vocational expert answered that this was not covered by the Directory of Occupational Titles (DOT) but, based on her review of "professional resources," she believed that being off task fifteen percent of the day would be job-preclusive. (Id.) When the ALJ added the limitation of needing "to be reminded of job tasks one to two times per day, past the training period," the vocational expert affirmed that "this, alone, is job-preclusive." (Tr. 76-77)

With respect to Plaintiff's medical treatment records, the Court adopts the facts Plaintiff provided in his statement of material facts and admitted by the Commissioner. [ECF Nos. 23-1, 30-1] The Court addresses specific facts related to the issues Plaintiff raises as needed in the discussion below.

### III. Standard for Determining Disability Under the Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. 42 U.S.C. § 423 (a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines disability as "the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. § 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. 404.1545(a)(1)); see also 20 C.F.R. §§ 416.920(e), 416.945(a)(1). Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

**IV.   ALJ Decision**

Applying the foregoing five-step analysis, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity during the period from his alleged onset dates of May 4, 2014 or May 12, 2015 through his date last insured of September 30, 2016; and (2) had the severe impairments of "polysubstance use disorder, amphetamine induced psychotic disorder with hallucinations, attention deficit hyperactivity disorder (ADHD), schizophrenia and bipolar disorder, which was diagnosed September 2015." (Tr. 28) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

The ALJ reviewed Plaintiff's testimony and medical records and determined that, while his "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 32) For example, although Plaintiff testified that Ms. Johnson did not allow him to drive, treatment notes reflected that he was involved in a car accident in February 2017. (Id.) Also, Plaintiff and Ms. Johnson testified that Plaintiff was "not allowed to cook" and had difficulty using his hands, completing tasks, and following instructions, but there was evidence that Plaintiff previously worked as a cook and was "active with his grandfather; learning to change the oil, yard work, and cooking." (Id.) Finally, the ALJ found that Plaintiff's full course load at community college undermined the alleged severity of his impairments. (Id.)

The ALJ acknowledged Plaintiff's "mental health issues" and "two inpatient stays in 2015," but observed that those hospitalizations were attributed to "drug induced psychosis." (Tr. 32-33) In addition, although Plaintiff was hospitalized for psychosis in 2017, he was "focused,

7

goal oriented, alert with appropriate calmness and reality, with no psychosis symptoms" at the time of discharge. (Tr. 33)

The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: "The claimant must avoid all exposure to dangerous machinery and avoid all exposure to unprotected heights. The claimant can perform simple, routine tasks, and can have occasional interaction with supervisors, coworkers and the public." (Tr. 30) At step four of the sequential evaluation, the ALJ found that Plaintiff was unable to perform his past relevant work. (Tr. 34) However, based on the vocational expert's testimony, the ALJ found that there existed a significant number of jobs in the national economy that Plaintiff was able to perform, including those of cleaner industrial, laundry laborer, and kitchen helper. (Tr. 35) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 36)

## V.     Discussion

Plaintiff claims that substantial evidence does not support the ALJ's decision because the ALJ: (1) failed to properly evaluate and provide "good reasons" for discrediting the opinion of Plaintiff's treating psychiatrist; and (2) improperly assigned "considerable weight" to the opinion of a non-examining psychological consultant. [ECF No. 23] The Commissioner counters that the ALJ properly evaluated the medical opinion evidence. [ECF No. 30]

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012

(8th Cir. 2000)). The Court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. Treating psychiatrist's opinion

Plaintiff claims the ALJ failed to properly evaluate the opinion of Plaintiff's treating psychiatrist, Dr. Malik. More specifically, Plaintiff contends that the "evidence that the ALJ cites to in support of her reasons for affording partial weight to the treating physician are not sufficient." [ECF No. 23 at 4] In response, the Commissioner asserts that the ALJ properly assigned Dr. Malik's opinion "some weight" and incorporated his limitations in the RFC.

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Reece v. Colvin, 834 F.3d 904, 908-09 (8th Cir. 2016) (internal quotations omitted). A treating physician's opinion, however, "does not automatically control, since the record must be evaluated as a whole." Id. at 909 (internal quotation omitted). "The ALJ may discount or

9

disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

Dr. Malik began treating Plaintiff in June 2015 when Plaintiff was admitted at Center Pointe Hospital for psychosis, depression, and thoughts of harming himself and Ms. Johnson. (Tr. 346) After Plaintiff's discharge five days later, Dr. Malik continued overseeing Plaintiff's mental health treatment and managing his medications through, at least, May 2018. (Tr. 18)

Dr. Malik completed a mental RFC questionnaire for Plaintiff in August 2017. (Tr. 445-49) Dr. Malik reported that Plaintiff had moderate-to-severe bipolar disorder, and his medications included monthly 400-mg Abilify injections, as well as benztropine, Remeron, Vyanse, and Fanapt. (Tr. 445) Dr. Malik noted that Plaintiff was compliant with his medication and had experienced "some improvement." (Id.) Dr. Malik recorded the following clinical findings: "flat affect, poor eye contact, suspicious, guarded, irritable/negative mood, decompensate under stress, not able to cope, [decreased] ability to function adequately, has to be

reminded to perform" activities of daily living (ADLs)."[4]  (Id.)   Dr. Malik described Plaintiff's prognosis as "fair" and estimated that Plaintiff's impairments or treatment would cause him to be absent from work "more than 4" days per month.  (Tr. 445, 449)

On a checklist of "mental abilities and aptitudes needed to do unskilled work," Dr. Malik noted that Plaintiff was either "unable to meet competitive standards" or "seriously limited but not precluded" in fourteen of the sixteen areas.[5]  Significantly, Dr. Malik found that Plaintiff was "unable to meet competitive standards" in the following areas:  "remember work-like procedures"; "sustain an ordinary routine without special supervision"; "work in coordination with or proximity to others without being unduly distracted"; "accept instructions and respond appropriately to criticism from supervisors"; and "deal with normal work stress."  (Tr. 447) Where the form prompted him to explain those findings, Dr. Malik wrote:  "pt has poor concentration and focus, unable to remember to do ADL's, has to be reminded; unable to cope with stress, decompensates; mood swings, will isolate, decreased energy and motivation, sleep varies."  (Id.)

The ALJ considered Dr. Malik's opinion and assigned it "partial weight" because "I find portions of this opinion seem excessive as compared to the treatment records."  (Tr. 34)

---

[4] On a checklist form, Dr. Malik noted that Plaintiff exhibited the following "signs and symptoms":  "blunt, flat or inappropriate affect"; "mood disturbance"; "difficulty thinking or concentrating"; "persistent disturbances of mood or affect"; "paranoid thinking or inappropriate suspiciousness"; "emotional withdrawal or isolation"; "bipolar syndrome with a  history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes…"; "intense and unstable interpersonal relationships and impulsive and damaging behavior"; "pathologically inappropriate suspiciousness or hostility"; "easy distractibility"; and "sleep disturbance." (Tr. 446)

[5] The form defined "unable to meet competitive standards" to mean that the "patient cannot satisfactorily perform this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting."  (Tr. 447)  "Seriously limited, but not precluded" was defined as "the ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances."  (Id.)

Specifically, the ALJ stated that Dr. Malik's limitations were inconsistent with evidence that Plaintiff: (1) was "able to accept instructions in cooking, yard work, and how to change oil"; (2) admitted to using drugs in 2015 and "experienced two inpatient stays as a result of drug induced psychosis"; (3) showed improvement in May 2016 and January 2017; and (4) was "enrolled in a full college course load." (Id.) The ALJ therefore assigned "some weight" to Dr. Malik's opinion that Plaintiff had limited abilities to interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel to unfamiliar places, and use public transportation. (Tr. 34) The ALJ found that Plaintiff could, however, sustain employment that involved "simple routine tasks" and "occasional interaction with supervisors, coworkers, and the public." (Tr. 30)

In regard to the ALJ's finding that Plaintiff was able to accept instructions in cooking, yard work, and oil changes, Plaintiff suggests that the ALJ mischaracterized a note in Plaintiff's medical records. In April 2016, Nurse Practitioner (NP) Stecher, who worked with Dr. Malik and regularly treated Plaintiff, wrote: "[Plaintiff c]ontinues to stay with Grandfather and it's having a positive effect. Grandfather is teaching him yardwork, oil changes, cooking and keeping him involved in life activities."[6] (Tr. 466)

This April 2016 note must be viewed in the context of the record as a whole. Plaintiff's treatment notes from February and March 2016 reveal that Plaintiff, who had been living with Ms. Johnson, moved in with his grandfather "while mom works 2 jobs." (Tr. 462, 466) Ms. Johnson explained this move at the hearing, stating: "…it's better for [Plaintiff] to stay with my parents, to watch him at every move…." (Tr. 70) In March, NP Stecher wrote that Plaintiff

---

[6] At that same appointment, NP Stecher also observed Plaintiff's: suspicious guarded attitude; dysthymic, irritable mood; flat affect; impaired concentration; moderately impaired judgment; and limited insight. (Tr. 466)

"needs constant direction and supervision for any task completion including ADL's." (Tr. 464) Furthermore, Plaintiff testified at the November 2017 hearing that he no longer helped his grandfather cut the grass because Plaintiff "stopped using hedge cutters, because I tried to harm an animal, but I thought it was…something else….I thought it was, like, demons or something…." (Tr. 61) The fact that Plaintiff was able to perform certain activities with his grandfather's assistance and supervision did not undermine Dr. Malik's opinion as to the debilitating effects of his mental impairments.

Plaintiff also challenges the ALJ's suggestion that two of Plaintiff's inpatient stays were the result of drug-induced psychosis. While Dr. Malik's notes referred to an earlier hospitalization at Mercy Hospital from June 10 through June 22, 2015 "for drug use and psychosis," the administrative record contained documentation of Plaintiff's later stays at Center Point Hospital in June 2015 and July 2017. According to those records, when Plaintiff arrived at Center Pointe Hospital on June 24, 2015, his urine drug screen was negative. (Tr. 352) As Dr. Malik noted the following month, "it all started on 9th of June after he smoked [marijuana] but then he continued to have psychotic [symptoms] and [auditory hallucinations]" (Tr. 414) When Plaintiff was readmitted to Center Pointe Hospital in July 2017 due to "increase in psychosis, delusions and paranoia," he tested negative for drugs. (Tr. 436-37) Nothing in Plaintiff's medical records establishes that Plaintiff's most recent psychotic episodes were drug-induced.

Next, Plaintiff argues that the ALJ improperly relied on isolated evidence of improvement in May 2016 and January 2017 to discredit Dr. Malik's opinion. The ALJ stated that "[b]y May 2016, the claimant is smiling, affect improved and he reported feeling better" and "[w]hile in January 2017, the claimant is noted having a flat affect and not sleeping well, his mood was fairly stable and he was getting ready for final exams." (Tr. 34)

13

An ALJ errs when she "relies[] too heavily on indications in the medical record that [the claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001). See also Nowling v. Colvin, 813 F.3d 1110, 1123 (8th Cir. 2016). Furthermore, "[i]t is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased. Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods." Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996) (internal citations omitted).

Although Plaintiff demonstrated improvement with medication in 2016, the record reflects a decline after January 2017. In February, Ms. Johnson informed NP Stecher that Plaintiff failed two of his college courses, "continue[d] to readily decompensate with stress," and needed reminders "to cut his nails, shower, dress, etc." (Tr. 473) When Plaintiff was hospitalized in July 2017, he was "talking about being an Egyptian God," he reported auditory hallucinations, and his "thought process was disorganized and delusional." (Tr. 436) Moreover, Dr. Malik and NP Stecher prescribed several different psychotropic medications for Plaintiff and regularly adjusted the dosages, suggesting that Plaintiff's symptoms were not controlled. The limited evidence of improvement in Plaintiff's condition did not support the ALJ's decision to discount Dr. Malik's medical opinion.

Finally, Plaintiff asserts the ALJ erred in finding that the "fact that the claimant is enrolled in a full college course load also does belies [sic] the opinion of Dr. Malik who note [sic] that the claimant cannot deal with stress." (Tr. 34) Plaintiff testified at the hearing that, despite attending community college for "two or three years," he remained at "a freshman level." (Tr. 56) Ms. Johnson testified that Plaintiff had been attending community college for four years

14

and had yet to pass his first-semester, freshman-level reading and math courses. (Tr. 71) Plaintiff's academic transcript reveals that Plaintiff had "attempted" sixty hours of course work and "passed" only twenty-one.[7] (Tr. 80-84) In light of this evidence, Plaintiff's academic performance did not, in fact, undermine Dr. Malik's opinion that Plaintiff was unable to deal with normal work stress.

Based on the above, the Court agrees with Plaintiff's assertion that the ALJ failed to provide "good reasons" for discrediting Dr. Malik's medical opinion. Dr. Malik was a specialist in the area upon which he rendered his opinion and he and his staff treated Plaintiff regularly (and sometimes several times per week) for over two years. Additionally, Dr. Malik's opinion was consistent with his own treatment notes and the record as a whole. Under the regulations applicable to Plaintiff's claim, Dr. Malik's opinion was entitled to controlling weight. See 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). "Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand." Land v. Berryhill, No. 4:16-CV-768 NCC, 2017 WL 4236976, at *7 (E.D. Mo. Sep. 25, 2017) (quoting Clover v. Astrue, 4:07-CV-574-DJS, 2008 WL 3890497, at *12 (E.D Mo. Aug. 19, 2008)).

C. Non-examining expert opinion

Plaintiff argues the ALJ erred in assigning "considerable weight" to the opinion of Dr. Morgan, the state agency consulting psychologist. Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. §§ 404.1527, 416.927. However, the rule is not absolute; a

---

[7] Plaintiff's college transcripts are part of the administrative record on appeal because the Appeals Council considered them in denying review of the ALJ's decision. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007); Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000).

treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Prosch, 201 F.3d at 1012-13; Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007).

Dr. Morgan reviewed Plaintiff's medical records and completed a psychiatric review technique and mental RFC assessment in October 2015. (Tr. 90-93) Based on his review, Dr. Morgan found that Plaintiff had schizophrenia and other psychotic disorders, ADD/ADHD, substance addiction disorders, and affective disorders. (Tr. 89-90) Dr. Morgan determined that, as a result of his mental impairments, Plaintiff had: mild restrictions in activities of daily living; moderate difficulties in social functioning and maintaining concentration, persistence, or pace; and "one or two" episodes of decompensation, each of extended duration. (Tr. 90) Dr. Morgan concluded: "Despite claimant's impairments, the medical evidence shows that claimant has the capacity to perform…work activities." (Tr. 93)

The ALJ considered Dr. Morgan's opinion and assigned it "considerable weight." (Tr. 33) In particular, the ALJ accepted Dr. Morgan's finding that Plaintiff's difficulties with concentration would restrict him to simple, unskilled work. However, the ALJ found that, based on Plaintiff's history of hearing voices, he also required "some limitation in interaction" with others. (Id.)

"[T]he opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records including relevant medical records made after the date of evaluation." McCoy, 648 F.3d at 616 (citing Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010)). Here, Dr. Morgan reviewed Plaintiff's medical records more than two years before the ALJ issued her decision. During the period of time between his evaluation and the ALJ's decision, Plaintiff continued receiving treatment for his mental

impairments, was diagnosed with bipolar disorder, and experienced significant psychiatric events, including a psychiatric hospitalization. In light of these circumstances, the ALJ erred in according considerable weight to Dr. Morgan's opinion.

## VI.     Conclusion

For the reasons stated above, the Court finds that the ALJ failed to properly weigh Dr. Malik's and Dr. Morgan's opinions and thus failed to properly assess Plaintiff's disability claim such that substantial evidence does not support the ALJ's determination. See, e.g., Gordon v. Astrue, 801 F.Supp.2d 846, 859 (E.D.Mo. 2011). Accordingly,

**IT IS HEREBY ORDERED** that pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of December, 2019